| | | |
|---|---|---|
| ROBERT and JENNY RAYMOND, individually and o/b/o of their minor son, J.R. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:18-cv-00379-JAW |
| MAINE SCHOOL ADMINISTRATIVE DISTRICT 6, PAUL PENNA and, JENNIFER DONLAN, | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

Two parents on behalf of themselves and their disabled son brought this lawsuit against a school district and two school employees asserting claims under 20 U.S.C. § 1681(a) (Title IX), 29 U.S.C. § 794(a) (§ 504 of the Rehabilitation Act of 1973), and 42 U.S.C. § 1983 stemming from a sexual assault committed against their son by another disabled student during a summer school program. The Defendants moved to dismiss the Plaintiffs' § 504 and § 1983 claims. The Defendants seek to dismiss the § 504 claim on the ground that the Plaintiffs failed to exhaust administrative remedies and seek to dismiss the § 1983 claim on the ground that the Plaintiffs failed to allege facts sufficient to allege a failure to protect claim and, if there are sufficient facts, the Defendants say they are entitled to qualified immunity. The Court concludes that in the circumstances alleged in the Complaint, the Plaintiffs are not required to exhaust administrative remedies under § 504 and denies the motion to

dismiss on the § 504 claim. The Court further concludes that under recent First Circuit authority, a dismissal of the § 1983 claim is premature, and the Court dismisses without prejudice the motion to dismiss on the § 1983 claim.

## I.    PROCEDURAL HISTORY

On September 18, 2018, Robert and Jenny Raymond, individually and on behalf of their minor son, J.R., (the Plaintiffs) filed suit against Maine School Administrative District 6 (MSAD 6), MSAD 6's Superintendent, Paul Penna, and, MSAD 6's Director of Special Services, Jennifer Donlan, (the Defendants) alleging violations of Title IX, § 504, and J.R's constitutional rights. *Compl.* (ECF No. 1).[1] On November 19, 2018, the Defendants moved to dismiss Counts Two and Three of the Complaint. *Mot. to Dismiss Counts II and III of Pls.' Compl* (ECF No. 9) (*Defs.' Mot.*). On December 21, 2018, the Plaintiffs responded, *Pls.' Opp'n to Defs.' Mot. to Dismiss Counts II and III of Pls.' Compl.* (ECF No. 16) (*Pls.' Opp'n*), and on January 3, 2019, the Defendants replied. *Reply Mem. in Support of Mot. to Dismiss Counts II and III Pls.' Compl.* (ECF No. 17) (*Defs.' Reply*).

## II.    FACTS[2]

### A.    The Parties

Robert and Jenny Raymond reside in Standish, Maine with their autistic son, J.R., who is a seventeen-year-old sophomore at Bonney Eagle High School and

---

[1]     Individually, Robert and Jenny Raymond claim reimbursement of costs and fees they incurred on behalf of J.R. *Compl.* ¶ 1.

[2]     Considering a motion to dismiss, a court "accept[s] all well-pleaded facts in the complaint as true." *Gilk v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) (quoting *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 36 (1st Cir. 2009)). A court also "construe[s] all reasonable inferences in favor of the plaintiff." *Sanchez*, 590 F.3d at 41.

receives special education and related services from MSAD 6 through its Individualized Education Program (IEP). *Compl.* ¶¶ 1-3. J.R has been a student at MSAD 6 schools since kindergarten. *Id.* ¶ 3.

MSAD 6 is a public entity within the meaning of Title IX and § 504 because it is a recipient of federal funding under applicable programs. *Id.* ¶ 7. MSAD 6's offices are located in Buxton, Maine. *Id.* ¶ 4. MSAD 6 is responsible "for providing education to residents of Buxton, Hollis, Limington, Standish, and Frye Island, Maine." *Id.* Paul Penna is the Superintendent of Schools of MSAD 6 and is "charged with supervision and management of all schools and all administrative departments within MSAD 6." *Id.* ¶ 5. Jennifer Donlan, as the Director of Special Services for MSAD 6, is "charged with supervision and management of the provision of special education and related services, including those provided to J.R." *Id.* ¶ 6.

## B. Background

Children with disabilities or special needs, like J.R., are more vulnerable to sexual assault than other children because—accurate or not—other students perceive them as passive or weak as well as "being trained by well-meaning caregivers to be compliant." *Id.* ¶ 11. Children with disabilities or special needs are also at an increased risk of victimization because they "may exhibit an intense desire to fit in and befriend other children[,]" and this desire to be accepted and "inability to set boundaries can leave these children 'vulnerable to coercion'" to engage "in sexual or other acts that they believe, or are told to believe, will lead to acceptance and friendship." *Id.* ¶ 12.

MSAD 6 has "a number of policies relative to student rights and responsibilities, codes of conduct, and procedures for preventing and addressing peer-to-peer harassment and violence to protect all students enrolled in MSAD 6 schools." *Id.* ¶ 10. J.R.'s 2016-17 IEP provided Extended School Year (ESY) services from July 10, 2017 to August 11, 2017, which included "transportation and participation in a specialized instruction program." *Id.* ¶ 14. "J.R.'s 2016-17 IEP states as one of J.R.s' unique needs [he] will continue to work on boundaries regarding who are safe and appropriate individuals to share personal information with," and the IEP further states "MSAD 6 will provide 2 students to 1 staff in all areas with the exception of lunch and social activities." *Id.* ¶ 13.

## C.    The Events

B.L., a sixteen-year-old student at Bonney Eagle High School, who has received special education and related services for a number of years, also participated in the 2017 ESY summer program. *Id.* ¶ 15. "B.L. has been the subject of one or more psychological evaluations and classroom or other clinical observations." *Id.* ¶ 17. B.L. has received special education and related services under an IEP, which required MSAD 6 to provide him with "similar or more restrictive level of supervision and oversight as it did with J.R." *Id.* ¶ 16. MSAD 6 "supplemented B.L.'s IEP with one or more of the following: Behavior Intervention Plan(s) (BIP), Functional Behavior Assessment(s) (FBA), and/or Positive Behavioral Interventions & Supports (PBIS) to address his behavior at school." *Id.* ¶ 18. B.L. "sexual assaulted, or engaged in highly inappropriate sexual activity with another special education student" that MSAD

became aware of shortly thereafter. *Id.* ¶ 19. MSAD 6 was also aware that in June 2017, B.L. allegedly assaulted a minor at the Maine Mall. *Id.* ¶ 20. Based on these events, MSAD 6 was aware that B.L. posed a risk of sexual violence to his peers. *Id.* ¶ 21.

On July 10, 2017, the first day of the ESY summer program, B.L. told J.R. to meet him in the bathroom at approximately 1:40 p.m. *Id.* ¶ 22. J.R. followed B.L. into the bathroom and B.L. sexually assaulted him in a bathroom stall between 1:45 p.m. and 1:51 p.m. *Id.* ¶ 24. MSAD 6 staff were unaware that J.R. and B.L. had gone to the bathroom and were there together. *Id.* ¶ 25. That same day, at the Raymonds' home, J.R. told his mother, Jenny Raymond, about the sexual assault; Mrs. Raymond took J.R. to the emergency room where he informed the hospital personnel he had been sexually assaulted. *Id.* ¶¶ 26-27. A "rape kit" test confirmed that J.R. had been sexually assaulted. *Id.* ¶ 27. The Raymonds informed MSAD 6 and local law enforcement of the sexual assault. *Id.* ¶ 28.[3]

Pursuant to Title IX, MSAD 6 investigated the incident in August and September 2017, reviewing documents and other materials, including law enforcement's video-taped interview of J.R. *Id.* ¶ 29. In MSAD 6's September 26, 2017 written report, it concluded "that it was more likely than not that J.R. was the victim of a gross sexual assault on July 10, 2017." *Id.* ¶ 30. As a result of the sexual assault, J.R. experienced severe emotional distress and has been diagnosed with Post

---

[3]     Paragraph twenty-eight alleges the Plaintiffs informed local law enforcement and MSAD 6 of the sexual assault on July 10, 2018. *Compl.* ¶ 28. This must have been a typographical mistake given the preceding and subsequent allegations. Given this apparent error, the Court omits the cited date.

Traumatic Stress Disorder (PTSD). *Id.* ¶ 31. The Raymonds "incurred significant costs and expenses on behalf of J.R., including but not limited to those related to medical and mental health treatment for J.R., legal fees, and costs of litigation." *Id.* ¶ 32.

## III. LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v Twombly*, 550 U.S. 550, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "something more than merely possible or merely consistent with a defendant's liability." *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017) (citations and internal quotation marks omitted). This is a "'context-specific' job that compels [the Court] 'to draw on' [the judge's] 'judicial experience and common sense.'" *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679).

This is a two-step process. *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual

allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García–Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citation omitted). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (citation omitted).

## IV.    POSITIONS OF THE PARTIES

### A.    The Defendants' Memorandum

The Defendants move to dismiss with prejudice Count Two (§ 504) and Count Three (§ 1983) of the Complaint. *Defs.' Opp'n* at 1. The Defendants say "[t]his is a negligence claim disguised as a federal case brought under Title IX of the Education Amendments of 1972, 20 U.S.C. [§]§ 1681, *et seq*, Section 504 of the Rehabilitation Act of 1973 (the 'Rehabilitation Act'), and 42 U.S.C. § 1983." *Id.* at 2 (footnote omitted).

The Defendants contend that the Plaintiffs' § 1983 claim is premised on a "vague" basis in that "the Defendants violated Plaintiff's constitutional rights, including his right to equal protection under the law and substantive due process rights." *Id.* at 4 (citing *Compl.* ¶ 49) (internal quotation marks omitted). The Defendants aver that to state a substantive due process claim, the Plaintiffs need to show a "deprivation of a protected interest in life, liberty or property that was caused by government conduct." *Id.* (citing *Rivera v. Rhode Island*, 402 F.3d 27, 33-34 (1st Cir. 2005)). Because J.R.'s injuries were caused by another student, not government

actors, the Defendants say the Plaintiffs are asserting a failure to protect claim under § 1983. *Id.* at 4-5.

Quoting *DeShaney v. Winnebago County*, 489 U.S. 189 (1989), the Defendants note that the affirmative duty to protect "arises not from the State's knowledge of the individual's predicament or from expressions of intent to help him but from the limitation which it has imposed on his freedom to act on his own behalf . . . through incarceration, institutionalization, or other similar restraint of personal liberty." *Id.* at 5 (quoting *DeShaney*, 489 U.S. at 200). In the Defendants' eyes, however, the Complaint is devoid of factual allegations to show a "special relationship" between J.R. and any of the Defendants. *Id.* The Defendants claim that "[t]he First Circuit has recognized that the Circuit Courts addressing this issue have uniformly rejected a special relationship between a student and a public school, holding that school children are not captives of the school authorities and the basic responsibility for their care remains with their parents." *Id.* at 5-6 (internal quotation marks omitted) (quoting *Hasenfus v. LaJennesse*, 175 F.3d 68, 71 (1st Cir. 1999) (collecting cases)). The Defendants say the Plaintiffs also fail to state a § 1983 substantive due process claim because they do not allege conduct that "shocks the conscience." *Id.* at 6.

In the alternative, the Defendants argue that if the Court finds the Plaintiffs have sufficiently pleaded a § 1983 claim, the individual Defendants are entitled to qualified immunity. *Id.* In determining qualified immunity, the Defendants aver that courts analyze "whether the facts make out a constitutional violation, and [] whether the violated right was clearly established at the time that the offending

conduct occurred." *Id.* at 7 (citing *Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014)). According to the Defendants, the Plaintiffs have not claimed that either individual Defendant violated J.R.'s constitutional rights, rather they failed to adequately train MSAD 6 staff. *Id.* (citing *Compl.* ¶¶ 56, 58). The Defendants argue to state claim under a theory of failure to train, "the Plaintiff[s] must show an actual policy of inadequate training, where the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 8 (internal quotation marks omitted) (quoting *Ms. K v. City of S. Portland*, 407 F. Supp. 2d 290, 297 (D. Me. 2006) (quoting *City of Canton v. Harris*, 498 U.S. 378, 390 (1989))). The Defendants say the Complaint does not make any allegations "that meet this rigorous standard." *Id.*

In addition, the Defendants contend that the Plaintiffs have failed to state a claim under § 504 because they failed to exhaust administrative remedies. *Id.* at 9 (citing 20 U.S.C. § 1451(*l*)). To support their argument, the Defendants cite *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017), and aver that "the U.S. Supreme Court held that under §1415(*l*), exhaustion is necessary when the gravamen of the plaintiff's suit is the denial of FAPE (free appropriate public education)." *Id.* (citing *Fry*, 137 S. Ct. at 754). The Defendants interpret *Fry* to mean that "if a lawsuit raising claims under other antidiscrimination statutes seeks relief for the denial of a FAPE, as opposed to just disability-based discrimination, 'the plaintiff cannot escape §1415(*l*) [exhaustion requirement] merely by bringing the suit under a statute other

than the IDEA' and must first 'submit her case to an IDEA hearing officer.'"  *Id.*
(citing *Fry*, 137 S. Ct. at 754).

The Defendants outline the *Fry* Court's guidance on determining whether the
gravamen of a complaint is a denial of FAPE, and say in light of the guidance, the
Complaint's § 504 claim's gravamen is a denial of FAPE and administrative
exhaustion is required.  *Id.* at 10 (quoting *Fry*, 137 S. Ct. at 756 ("First, could the
plaintiff have brought essentially the same claim if the alleged conduct had occurred
at a public facility that was not a school—say, a public theater or library? And second,
could an *adult* at the school—say, an employee or visitor—have pressed essentially
the same grievance?").  Thus, the Defendants contend the "Plaintiffs seek to plead
around the Supreme Court's holding in *Fry*[]" but they argue that *Fry* dictates their
§ 504 claim be dismissed.  *Id.* at 11.

## B.    The Plaintiffs' Response

Noting that the standard is whether they have pleaded sufficient facts "to show
that the claims against the Defendants have substantive plausibility," they contend
they have met this standard.  *Pls.' Opp'n* at 2-3 (citing *Johnson v. City of Shelby*, 135
S. Ct. 346, 347 (2014); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103 (1st
Cir. 2014); *Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15 (1st Cir. 2014)).
The Plaintiffs assert the Defendants' motion to dismiss incorrectly attempts to apply
a heightened pleading standard.  *Id.* at 3.  The Plaintiffs claim their Complaint "need
not plead facts sufficient to make a prima facie case or allege all facts necessary to

succeed at trial," and they have asserted sufficient allegations to satisfy the required pleading standard. *Id.* (quoting *Medina-Velázquez*, 767 F.3d at 108).

The Plaintiffs say the "Defendants erroneously claim that the § 1983 claim is based on a theory that Defendants are liable because they failed to protect J.R." *Id.* (citing *Defs.' Mot.* at 4-5). The Plaintiffs maintain that their § 1983 claim is premised on theory that the Defendants violated J.R.'s constitutional rights of equal protection and substantive due process. *Id.* (citing *Compl.* ¶ 49). In the Complaint, the Plaintiffs allege that the Defendants were "grossly negligent" or "deliberately indifferent" towards J.R.'s constitutional rights because they were aware of B.L.'s past sexual violence and the threat he posed to other students, including J.R., but they failed to take appropriate action or willfully disregarded those known risks. *Id.* at 4 (citation omitted). The Plaintiffs aver "to avoid any 'vagueness', as Defendants contend, Count III expressly alleges Defendants were deliberately indifferent." *Id.* (citing *Compl.* ¶ 55). The Plaintiffs contend that the Defendants "had a custom or policy of allowing a student with sexually violent proclivities go unsupervised into the bathroom with a student whom it also knew had challenges establishing boundaries with others," which makes them liable under § 1983. *Id.* (citing *City of St. Louis v. Paprotnik*, 485 U.S. 112, 123 (1988); *Compl.* ¶¶ 13, 25).

The Plaintiffs claim they sufficiently pleaded an equal protection claim because they allege that the Defendants "acting under the color of law, treated J.R. as 'less than' the non-disabled students at Bonney Eagle High School by exposing him to

known dangers to his bodily integrity and emotional well-being to which it would not have exposed its non-disabled students." *Id.* at 5 (citing *Compl.* ¶¶ 10-12).

As for their substantive due process claim, the Plaintiffs argue that there is a protected interest in one's own "bodily integrity" and that the Defendants' conduct "shocks the conscience" because the Defendants allowed "B.L. to travel, unrestrained and unsupervised, throughout the school, Defendants created an unreasonable risk of harm to students, including J.R." *Id.* at 5-6 (citations and emphasis omitted). The Plaintiffs contend they adequately alleged a state-created danger theory, and, through discovery, they are confident that they will be able to show that the Defendants' conduct "shocks the conscience." *Id.* at 6-7.

The Plaintiffs maintain that the individual Defendants are not entitled to qualified immunity. *Id.* at 7. The Plaintiffs cite various allegations related to Jennifer Donlan's and Paul Penna's conduct, which they said led directly to J.R.'s assault. *Id.* at 7-8. The Plaintiffs argue the constitutional violations they allege have been clearly established and that the Defendants' arguments are more suitable for a motion for summary judgment than a motion to dismiss. *Id.* at 8.

The Plaintiffs argue that their § 504 claim is not subject to administrative exhaustion. *Id.* The Plaintiffs agree with the Defendants that *Fry* sets forth the appropriate legal standard but claim the Defendants incorrectly applied it to their Complaint. *Id.* According to the Plaintiffs, the Defendants erred in their assertion that because "the Complaint contains an allegation that Defendants failed to follow J.R.'s IEP, then the claims must therefore be related to a denial of J.R.'s right to a

[FAPE] as required by the Individuals with Disabilities in Education Act ('IDEA')." *Id.* at 8-9. Instead the Plaintiffs assert their allegation that the Defendants also violated J.R's IEP is additional evidence of discriminatory animus. *Id.* at 9. As a result, the Plaintiffs argue the Defendants "fail to recognize that the 'gravamen' of Plaintiff's disability discrimination claim relates *not* to whether J.R. was denied FAPE . . . . [But rather the] discrimination that resulted in horrific personal injury, and whether money damages should be awarded to Plaintiffs for J.R.'s physical and emotional injuries as a result . . .." *Id.* (emphasis in original).

The Plaintiffs claim, "the facts alleged, if adapted to the 'library' or 'adult' scenarios, would lead to a conclusion that Plaintiffs' claims under Section 504 would remain viable." *Id.* at 10. The Plaintiffs say restrooms are public facilities and that "J.R.'s right to be free from sexual assault in a library, or as an adult, would be similarly protected under Section 504 if it was demonstrated that the defendants in those scenarios had similar *foreknowledge*" that he was vulnerable to assault, another individual had a demonstrated propensity to commit sexual violence, and there was "a policy or custom of disregard for the known risks presented by the sexually violent patron toward others." *Id.* (emphasis in original). In the Plaintiffs' eyes, even if the Complaint "in some way suggest a denial of FAPE, the gravamen of the Complaint is for relief for 'simple discrimination, irrespective of the IDEA's FAPE obligation.'" *Id.* at 11 (citing *Fry*, 137 S. Ct. at 754).

### C. The Defendants' Reply

The Defendants claim the Plaintiffs' opposition memorandum misconstrues the appropriate legal standard under Rule 12(b)(6), and the Plaintiffs merely stated "the correct verbiage to state claims under 42 U.S.C. § 1983 and Section 504 of the Rehabilitation Act" but failed to adequately allege facts to support those claims. *Defs.' Reply* at 1. The Defendants say the Plaintiffs correctly identify that liability may flow to a school district when that district's custom or policy causes the deprivation of a student's rights or is otherwise "the result of an act of the district's policy-maker(s) in that area of the school's business." *Id.* at 2 (citing *Pls.' Opp'n* at 2). Although the Plaintiffs identified the correct caselaw, according to the Defendants, "they have not pled facts that, if true, would establish such a policy [because they cite one incident on the first day of summer program, meaning what occurred could not have been the result of a district custom or practice under First Circuit precedent.]" *Id.* (citing *Bordanro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989); *Kibbe v. City of Springfield*, 777 F.2d 801, 805 (1st Cir. 1985) (alterations in ordering)). The Defendants argue similarly that the Plaintiffs have not adequately pleaded an equal protection claim because "nowhere in the complaint is it alleged . . . that disabled and nondisabled students are treated differently at Bonney Eagle High School." *Id.* at 3.

As to qualified immunity, the Defendants reiterate that immunity should be dealt with at the earliest possible stage. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001)). They say "if all a plaintiff had to do was plead the elements of a claim under § 1983 as Plaintiffs have done here, immunity could never be decided at an early stage." *Id.* The Defendants aver that the Complaint lacks alleged facts to show

that any of the individual defendants were deliberately indifferent considering that "B.L. has never assaulted any student at school[,]" and in regard to Paul Penna, "there is no allegation that Defendant Penna knew anything about B.L. or his history." *Id.*

The Defendants argue that the Plaintiffs are still required to exhaust their administrative remedies even if money damages are sought. *Id.* at 4 (citing *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 60 (1st Cir. 2002)). As the Defendants see it, the "Plaintiffs' entire Count II is based on the concern that the District was not providing J.R. with appropriate services in his public education and their argument that the District's failure to follow through with services caused J.R. harm [which means] [t]his is the gravamen of their claim" and exhaustion of administrative remedies is required. *Id.*

## V. DISCUSSION

### A. Section 1983 Claim

"[T]o state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law." *Cruz–Erazo v. Rivera-Montanez*, 212 F.3d 617, 621 (1st Cir. 2000). The Plaintiffs assert their § 1983 claim is premised MSAD 6's custom or policy or the decision-making of MSAD policymakers which led to the deprivation of J.R.'s constitutional rights. *Pls.' Opp'n* at 4. They contend "the Complaint sufficiently alleges the very heart of the case is that Defendants, acting under the color of law, treated J.R. as 'less than' the non-disabled

students at Bonney Eagle High School by exposing him to known dangers to his bodily integrity and emotional well-being to which it would not have exposed its non-disabled students[,]" and adequately allege a substantive due process claim based on a "state created danger theory." *Id.* at 5-7.

### 1. Substantive Due Process

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197. A government actor may nevertheless be liable for their indirect actions in failing to stop a private violent act against an individual in two circumstances. One is where there is a "special relationship" between the government actor and the individual. *Id.* at 197-200; *Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 297 (D. Mass. 2017). However, the Plaintiffs' substantive due process claim is not premised on MSAD 6's special relationship with J.R. Rather, it is premised on the second scenario: a state-created danger theory. *Pls.' Opp'n* at 6.

Some circuit court of appeals "have recognized the existence of the state-created danger theory[.]" *Irish v. Maine*, 849 F.3d 521, 526 (1st Cir. 2017). The Court of Appeals for the First Circuit "has discussed the possible existence" of the state-created danger theory but has not "found it applicable to any specific set of facts." *Id.* at 526. Under a stated-created danger theory, a plaintiff must show that a "government employee, in the rare and exceptional case, affirmatively act[ed] to

increase the threat of harm to the claimant or affirmatively prevent[ed] the individual from receiving assistance." *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 77 (1st Cir. 2007) (quoting *Frances-Colon v. Ramirez*, 107 F.3d 62, 64 (1st Cir. 1997)).

There is, however, a "'further and onerous requirement' that the state's actions 'shock the conscience of the court.'" *Id.* (quoting *Rivera*, 402 F.3d at 35). To shock the conscience, the governmental action must be "egregious" and "outrageous." *Melendez-Garcia v. Sanchez*, 629 F.3d 25, 37 (1st Cir. 2010) (quoting *Rivera*, 402 F.2d at 36 (quoting *County of Sacramento v. Lewis*, 524 U.S. 833, 847 n.8 (1998))). "In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" *Id.* (citation omitted).

## 2. Equal Protection

To state an equal protection claim, the plaintiff must "show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." *Cordi–Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (citing *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996)). Specifically, a plaintiff must allege facts showing that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis v. Coakley*, 802 F.3d 128, 132-33 (1st Cir. 2015) (citation

and internal quotation marks omitted); *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006).

### 3. Analysis

Taking the Plaintiffs' allegations as true, the Court concludes it is premature to dismiss the Plaintiffs' § 1983 claim. The Plaintiffs assert the Defendants were aware that before July 10, 2017—the day of the assault—J.R.'s perpetuator had engaged in one instance of highly inappropriate sexual activity or sexual assault with another student, and one instance of sexual assault against another individual off school grounds and posed an imminent threat to J.R., who was especially vulnerable to abuse, but that they willfully disregarded these known risks and failed to prevent J.R.'s assault. *Compl.* ¶¶ 12, 19-21, 25, 51, 55-56; *Pls.' Opp'n* at 4. The Plaintiffs allege MSAD 6 unlawfully followed a custom or policy in allowing B.L. to interact with other students when he should have been supervised by school personnel and that MSAD failed to adequately train its personnel and follow its own policies specific to J.R. *Compl.* ¶¶ 12-13, 50.

As presently constituted, the record is lacking any facts which speak to whether Defendants' actions in allowing B.L. to attend MSAD 6's summer ESY program knowing of his prior violent sexual incidents and placing him on a similar or higher restrictive level of supervision but failing to supervise or not requiring supervision for him to use the school's restroom facilities was in accordance with MSAD's policies. The Complaint alleges that MSAD 6 supplemented B.L.'s IEP with three different behavioral programs and that he received "similar or more restrictive

level of supervision and oversight as it did with J.R." *Id.* ¶¶ 16, 18. The Complaint asserts under J.R's IEP, "MSAD 6 will provide 2 students to 1 staff in all areas with the exception of lunch and social activities." *Id.* ¶ 13. Yet, it is not clear if either J.R's or B.L's IEP, which may be more restrictive than J.R.'s, contemplates staff supervision in school bathrooms or whether MSAD 6 had a supervision procedure or protocol for managing students who present a greater known threat to other students.

Critical to this disposition is *Irish v. Maine*, a 2017 First Circuit decision. In *Irish*, the First Circuit concluded it was premature to grant the defendants' motion to dismiss where:

> The record here is devoid of any facts on whether the State Police officers' decision to leave a voice message for Lord—despite Lord's foreseeable violent reaction; despite the fact that they were at the very outset of an investigation into allegations of violent assault, rape, and threats to kill; and without any effort to calm him down or prevent him from inflicting harm—was in line with police protocol and training.[4]

849 F.3d at 527.

The *Irish* Court noted previous cases where it looked to the absence or the degree of deviations from the pertinent governmental trainings and protocols to inform its substantive due process and qualified immunity analyses. *Id.* at 528 (citing *Stamps v. Town of Framingham*, 813 F.3d 27 (1st Cir. 2016); *Marrero-Rodriguez v. Municipality of San Juan*, 677 F.3d 497 (1st Cir. 2012)). Courts have

---

[4]      *Irish* concerned a terrible tragedy in Aroostook and Penobscot Counties, Maine, in July of 2015. Anthony Lord, Brittany Irish's former boyfriend, entered her house, shot and killed her new boyfriend, shot and grievously wounded her mother, and abducted her. *Irish*, 849 F.3d at 523. This all transpired after a "State Police officer left Lord a voice message, which notified him that Irish had made a complaint about Lord's serious violent crimes against her earlier . . . . The officer left . . . this message despite Irish's explicit request [not to do so for fear] that this action would incite further violence from Lord." *Id.*

similarly looked to a school's policies and procedures in evaluating whether the claimant adequately stated a § 1983 claim and whether the defendants are entitled to qualified immunity. *See Hasenfus*, 175 F.3d at 73-74 (analyzing and citing *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1261 (10th Cir. 1998) (affirming denial of summary judgment as to individual defendants on plaintiff's § 1983 substantive due process claim where a student committed suicide after being sent home from school whom had previously threatened to kill himself, but contrary to school policy, the officials did not notify his parents that he had been sent home and school officials were aware that the student had access to firearms)); *Doe v. Town of Wayland*, 179 F. Supp. 3d 155, 160-62, 169 (D. Mass. 2016) (finding plaintiff stated a § 1983 claim where he was allegedly abused by a sixteen-year-old student and friend of his older brother and where defendants were aware his alleged abuser had a history of sexually abusing children and "instituted a policy that required employees to supervise abuser at all times[,]" yet allowed the alleged abuser to abuse another student at least two times and did not notify parents of these assaults, did not remove the student from school's vocational program, or alter his supervision, and then encouraged a friendship between the plaintiff's older brother and the alleged abuser without informing plaintiff's parents of abuser's past sexual violence and need for supervision).

While the Complaint alleges B.L. previously committed two sexual assaults— one with a fellow special education student and one with another minor—and that the Defendants were aware of these incidents and that B.L. posed a risk of sexual

violence to other students, the record is devoid of any facts as to what exactly the Defendants knew of these incidents and from their evaluations of B.L. before his assault on J.R. To answer these questions, the Court concludes a fuller development of the facts are necessary. *Irish*, 849 F.3d at 529 ("[W]e cannot reach any of these conclusions without a fuller development of the facts"). As in *Irish*, it may be that discovery shows that the individual defendants did not violate any protocols or procedures and thus, the Complaint may be more vulnerable to a renewed motion to dismiss or a later motion for summary judgment. *Id.* at 523 ("While . . . these issues can certainly be decided at the motion to dismiss stage, they are often decided after some factual development or at summary judgment") (citations omitted).[5]

It is also premature to conclude that MSAD 6 is not liable. While the Plaintiffs' allegations center around J.R's sexual assault, taking all reasonable inferences in their favor, the Plaintiffs' allegations encompass a wider scope of misconduct by MSAD 6 and the individual Defendants in permitting B.L. to attend the ESY summer program and not taking additional steps to ensure student safety in light of B.L.'s previously known sexual assaults. *See Doe*, 179 F. Supp. 3d at 172-73 (concluding that the "single incident" holding in *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) in light of the First Circuit's precedent *in Baron v. Suffolk Cty. Sheriff's Dep't*, 402 F.3d 225, 239 (2005) and *Kibbe*, 777 F.2d at 807, did not warrant dismissal

---

[5] The First Circuit's opinion in *Irish* may set a new standard for analyzing motions to dismiss such as the one presented in this case or it may be grounded on a unique and particularly horrendous set of facts. Rather than ignore *Irish*, the Court has done its best to apply it, including the *Irish* Court's view that a renewed motion to dismiss or motion for summary judgment might require a different result.

of plaintiff's § 1983 claim against town and school program because "[a]lthough he . . . allege[d] conduct pertaining to one particular friendship" his allegations of misconduct were not limited to that single relationship).

The Court dismisses without prejudice the Defendants' motion to dismiss Count III of the Complaint.

### B.     IDEA Exhaustion and Section 504 Claim

The Defendants say the "Plaintiffs' entire Count II is based on the concern that the District was not providing J.R. with appropriate services in his public education and their argument that the District's failure to follow through with services caused J.R. harm." *Defs.' Reply* at 4. As a result, the Defendants contend that the Plaintiffs failed to exhaust their administrative remedies under § 1415(*l*). *Id.* The Plaintiffs say the Defendants' violation of J.R.'s IEP is only evidence of their discriminatory animus, but not the claim's gravamen. *Pls.' Opp'n* at 9. According to the Plaintiffs, the "Defendants fail to recognize that the 'gravamen' of Plaintiff's disability discrimination claim relates not to whether J.R. was denied FAPE or is entitled to compensatory education . . . [but rather] to discrimination that resulted in horrific personal injury, and whether money damages should be awarded . . . for J.R.'s physical and emotional injuries . . .." *Id.*

"The IDEA offers federal funds to States in exchange for a commitment: to furnish a free appropriate public education [FAPE] to all children with certain physical or intellectual disabilities." *Fry*, 137 S. Ct. at 748. A child's "individualized education program" (IEP) is the primary means by which schools provide that child

with FAPE. *Id.* at 749 (citations omitted). "Section 1415(*l*) requires that a plaintiff exhaust the IDEA's procedures before filing an action under the ADA, the Rehabilitation Act, or similar laws when (but only when) [his] suit seeks relief that is also available under the IDEA." *Id.* at 752 (internal quotation marks omitted). That is, administrative exhaustion is required under the IDEA when the "gravamen" of the complaint seeks to redress the denial of a FAPE. *Id.* at 752, 758. To make this determination, the Court must look at "the substance, or gravamen" of the complaint. *Id.*; *see also id.* at 758 (explaining that gravamen of a complaint equates to the plaintiff's injuries being "educational in nature") (internal quotation marks omitted).

"Several facts may be relevant to the 'gravamen' analysis, including whether the complaint alleges a deficiency in the student's . . . IEP or accuses the school of 'refusing to provide the educational instruction and services' that the student needs, and whether the plaintiff initially pursued IDEA administrative remedies before filing suit." *McCann on Behalf of J.M. v. York Sch. Dep't*, No. 2:18-cv-00336-JDL, 2019 WL 542284, at *6 (D. Me. Feb. 11, 2019) (quoting *Fry*, 137 S. Ct. at 758). To state a plausible claim under § 504 of the Rehabilitation Act, the complaint must allege (1) that J.R. is an individual with a disability, (2) that he is otherwise qualified to receive the benefits of a program (3) that received federal financial assistance, and (4) that he was denied the benefits of the program solely by reason of his disability. *See* 29 U.S.C.A. § 794(a).

The Defendants correctly observe that the Plaintiffs' demand for monetary damages under § 504 does not foreclose the exhaustion requirement under the IDEA.

*Defs.' Reply* at 4 (citing *Frazier*, 276 F.3d at 64 (alteration to citation)).  This does not end the matter.  "In effect, § 1415(*l*) treats the plaintiff as 'the master of the claim': [He] identifies its remedial basis—and is subject to exhaustion or not based on that choice."  *Fry*, 137 S. Ct. at 755.  Still, it is the substance of the claim that dictates whether exhaustion is required.  The Plaintiffs allege, "[t]hrough its acts and omissions . . . including but not limited to failing to provide requisite 2-to-1 supervision, Defendant denied J.R. an equal opportunity to participate in nonacademic and extracurricular programs and services free from harassment or physical harm."  *Compl.* ¶ 44.  The Plaintiffs argue "[t]he IDEA was intended to ensure the provision of FAPE [provide an student with individually tailored educational services], not to protect a special education student from being sexually assaulted in the school bathroom."  *Pls.' Opp'n* at 10.

This is a close question.  Taking the Plaintiffs' allegations as true and construing all reasonable inferences in their favor, the Court concludes the Plaintiffs are not required to exhaust their administrative remedies under the IDEA.  To determine whether exhaustion is required, the *Fry* Court instructed courts to ask two questions:

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school— say, a public theater or library?  And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?

137 S. Ct. at 756 (emphasis in original).  The Plaintiffs say their allegations illustrate no exhaustion is needed in answering these two questions and posit:

> Restrooms are the quintessential "public facility." J.R.'s right to be free
> from sexual assault in a library, or as an adult, would be similarly
> protected under Section 504 if it was demonstrated that the defendants
> in those scenarios had similar foreknowledge of: (a) a disabled patron
> who was already vulnerable assault; (b) another patron who had
> demonstrated a propensity toward sexual violence on multiple occasions
> in prior months; and (c) a policy or custom of disregard for the known
> risks presented by the sexually violent patron toward others.

*Pls.' Opp'n* at 10 (emphasis omitted).

The Court agrees. The basis for J.R's claim—a sexual assault in restroom—could be brought if it occurred in another public facility. A disabled adult individual, moreover, could press "essentially the same grievance []" as J.R., if he or she was more susceptible to assault or abuse; a public entity was aware that another individual at that public entity had a history of committing sexual assault, partly at that public entity, but failed to prevent this other individual from assaulting the disabled individual. *See Fry*, 137 S. Ct. at 756. The Plaintiffs argue such actions constitute deliberate indifference and thus, discrimination towards J.R. *Pls.' Opp'n* at 10-11.

Neither party has referenced the "history of [this case's] proceedings" and the Court has not gleaned anything from the Complaint to suggest the Plaintiffs have "previously invoked the IDEA's formal procedures to handle the dispute." *Fry*, 137 S. Ct. at 757. The Plaintiffs' allegation that Defendants failed to follow J.R.'s IEP by providing the requisite level of supervision and thus, allowing B.L. to follow J.R. into the restroom unattended, partially overlap with the IDEA's "means and ends" as it concerns MSAD's alleged failings in handling J.R.'s "unique needs." *Id.* at 755. But that overlap does not preclude the Plaintiffs from seeking relief under § 504. *Id.* at

756 ("The same conduct might violate all three statutes . . . [so] a plaintiff might seek relief for the denial of a FAPE under Title II and § 504 as well as the IDEA. But still . . . a complaint brought under Title II and § 504 might instead seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation").

Moreover, the Plaintiffs allege "[t]hrough its acts and omissions . . . <u>including but not limited to failing to provide [the] requisite 2-to-1 supervision</u>, Defendant denied J.R. an equal opportunity to participate in nonacademic and extracurricular programs and services free from harassment or physical harm." *Compl.* ¶ 44 (emphasis provided). Thus, the Plaintiffs' § 504 claim is not contained only to MSAD 6's failure to follow J.R.'s IEP. Looking at the allegations as a whole, the Court does not view the Plaintiffs' § 504 claim as being principally grounded in MSAD 6's alleged failure to provide a FAPE but as asserting that the Defendants' failure to stop J.R.'s sexual assault in the school restroom was because of his disability. Therefore, administrative exhaustion is not required.

The Court denies the Defendants' motion to dismiss Count II of the Complaint.

## VI. CONCLUSION

The Court DENIES Maine School Administrative District 6, Paul Penna, and Jennifer Donlan's Motion to Dismiss Count II and DISMISSES without prejudice Maine School Administrative District 6, Paul Penna, and Jennifer Donlan's Motion to Dismiss Count III of Plaintiffs' Complaint (ECF No. 9).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 14th day of May, 2019.